```
1            IN THE DISTRICT COURT OF THE UNITED STATES
                     DISTRICT OF SOUTH CAROLINA
2                        CHARLESTON DIVISION

3    UNITED STATES OF AMERICA,   )        2:15-CR-665
                                 )
4                  Plaintiff     )        Charleston,
                                 )        South Carolina
5    vs.                         )        April 3, 2017
                                 )
6    ALAN WALKER,                )
                                 )
7                  DEFENDANT     )

8               TRANSCRIPT OF SENTENCING HEARING
             BEFORE THE HONORABLE PATRICK M. DUFFY,
9             SENIOR UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Plaintiff:    MR. JAMES MAY
                           Assistant United States Attorney
12                         1441 Main Street
                           Columbia, SC 29201
13

14

15   For the Defendant     MS. CAMERON BLAZER
                           Blazer Law Firm
16                         1037 Chuck Dawley Boulevard
                           Mount Pleasant, SC 29464
17

18

19

20

21

22
     Court Reporter:       Amy C. Diaz, RPR, CRR
23                         P.O. Box 835
                           Charleston, SC 29402
24

25          Proceedings recorded by mechanical shorthand,
     Transcript produced by computer-aided transcription.
```

1          THE COURT:  You can call the case.

2          MR. MAY: *United States of America vs. Alan Roy*

3   *Walker*, docket number 2:15-665.

4          Your Honor, the Pretrial Service report has been

5   prepared.  The Government has no objections.  I believe the

6   defense has two.

7          THE COURT:  Okay.  Thank you.

8          Ms. Blazer, I didn't get a chance until just before

9   the hearing to read your sentencing terms, but I have read

10  them all, including the attachments.  If you are ready to

11  proceed, tell me what your objections are.

12         MS. BLAZER: I am, Your Honor.  And I guess moving

13  from the easiest to the more challenging first, with regard

14  to the second objection, I think that the addendum addresses

15  my concern.  All I wanted to ensure is that Mr. Walker will

16  not be subjected to sex offender polygraph testing unless he

17  is deemed to need that sex offender treatment during the term

18  of his --

19         THE COURT:  I think it's mooted, as well.  So thank

20  you.  Go ahead.

21         MS. BLAZER: So the only remaining objection is to

22  the enhancement 2G1.3(b)(2)(B) due to undue influence.  And

23  I'm familiar with the case cited by the probation officer, as

24  well as a couple of cases that I believe the Government will

25  rely on in -- in opposition to my objection.  I think that

two things are important:

      First, the enhancement ought to be imposed only where we see something extremely out of the ordinary. I mean, the Guideline itself is intended to address issues, the kind of conduct that we have here in general. And then in specific, as I mentioned in my written objection, and as I think distinguishes this case from those which the Government will rely on, not withstanding the significant age disparity between Mr. Walker and Ms. May, the -- which certainly is a persuasive fact for the Court to consider -- Ms. May, as I think is documented in the PSR, endured a very troubled childhood and had acted out in a similar way with older men, resulting in prosecutions of, I believe, two men prior to her involvement with Mr. Walker. And so I don't think that that in any way excuses Mr. Walker's conduct, but it does call into question the degree to which she could have been unduly influenced. I recognize she was certainly not the age of consent, I acknowledge that, but that is a sort of precondition for us to be here.

      I think the question of undue influence is the next level consideration. And I think that there is record evidence to suggest that on multiple occasions, Mr. Walker actually tried to persuade her not to pursue a romantic entanglement, but to pursue a more parent and child relationship that she rejected. Again, I don't wish for my

 1    objection to in any way be construed as a request that this

 2    Court endorse the conduct or forgive the conduct, but I do

 3    think that it does not rise to the level of undue influence.

 4         THE COURT:  Happy to hear from the Government.

 5         MR. MAY: Yes, Your Honor.  Respectfully, the

 6    Application Note states that a ten-year difference has a

 7    rebuttable presumption arises for that ten-year difference.

 8    At the time Mr. Walker was 45 years old, and when this girl

 9    began to live with him, she was 14.  The back story of the

10    child was that her father had died when she was 12, so she

11    was looking for boundaries.  She was looking for somebody to

12    help establish the boundaries.  He started a sexual

13    relationship as she lived in his house.  When her parents or

14    her mother moved her to South Carolina, he continued that

15    relationship.  At one point he even bought her a wedding

16    dress and said, "Hey, we are going to get married." "Hey,

17    let's get married."  And then the last time he took her from

18    Aiken, South Carolina to North Carolina and then to Maine to

19    his parents' house.

20         The Government has handed up to the Deputy Court

21    Clerk a case of *United States vs. Reed*, it's a Sixth Circuit

22    case.  Head note 3, the Sixth Circuit looked at a District

23    Court who applied this presumption under 2G1.3(b)(2)(B).  In

24    that case, they say that the defendant in that case was

25    35 years older than the child.  He started the relationship

and led her to think that he was her boyfriend, encouraged
her to run away from the family.  To top it off, took her
hundreds of miles away from her home with no way to return.
That seems pretty much on point with this case.  The child at
the time was 15 years old, didn't have a driver's license,
could not return from Maine.  Your Honor, he told her that
they were getting married.  And in Ms. Blazer's own argument
says that he wanted to have a parent/child relationship,
which by its very nature has undue influence on a person.

Your Honor, the Government would state that
Probation has correctly applied this, that they have not met
the rebuttable presumption, and that it should be applied to
Mr. Walker's case.

THE COURT:  Thank you.

Ms. Blazer, I'll give you the last word if you want
to reply to that.

MS. BLAZER: No, sir, Your Honor.  I think that the
facts that Mr. May articulated, not withstanding some
implications of those facts, I don't quarrel with.

THE COURT:  Thank you.  Very difficult set of facts,
and I don't doubt for a minute that Mr. Walker thought at
times he was doing what he could to help this young lady.
And the problem is, it was very self-serving.  And not only
was the age difference so great, he actually had custody of
her and had sex with her while he had custody of her.  To me

1    the totality of those circumstances and what happened make it

2    impossible for me to think that the presumption has been

3    rebutted, and so I'm going to overrule the objection.  Thank

4    you.

5         With that in mind, let's look at the rest of the

6    Presentence Report.  Are there any other objections to the

7    Presentence Report?

8         MR. MAY: Not from the Government, Your Honor.

9         MS. BLAZER: No, sir, Your Honor.

10        THE COURT:  That being the case, I will accept the

11   factual statements in the Presentence Report as the Court's

12   finding of fact for purposes of this hearing.  Does anyone

13   object to my doing so?

14        MR. MAY: No, sir.

15        MS. BLAZER: No, sir.

16        THE COURT:  I would ask the clerk to make the

17   Presentence Report part of the record of this hearing.  That

18   being done, let's look at the Guidelines.  I'll consider

19   these Guidelines, together with the sentencing factors under

20   Title 18, Section 3553.  And let's make sure we have the

21   Guidelines agreed upon.

22        Total offense level is 27.

23        Criminal History Category is I.

24        The defendant is not eligible for probation.

25        The term of incarceration from 70 to 87 months.

1              Five years to life supervised release.

2              $12,500 to $125,000 fine.

3              And restitution, none has been requested.

4              There is a mandatory $100 special assessment fee.

5              Does anyone take issue with the Guidelines as read?

6              MR. MAY: No, Your Honor.

7              MS. BLAZER: No, sir.

8              THE COURT:  I will then take those into

9      consideration, as I said, with 3553(a) in reaching sentence.

10              At this point, I'll hear first from the Government

11      and then from the defendant regarding sentencing.

12              MR. MAY: Your Honor, the Government would ask the

13      Court to apply a Guideline sentence in this case.  The

14      Guidelines take into consideration the facts of the case, and

15      appropriately put him in a range that the punishment is not

16      more severe than it should be applied to him.

17              Your Honor, just for the record, the Government has

18      been sending notification to the victim.  It's my

19      understanding they have left the district and want to put

20      this behind them.  There has been no request for restitution.

21      That is the reason why there is no restitution being asked,

22      even though this is a mandatory restitution case.  Again, a

23      Guideline sentence is what the Government requests.

24              THE COURT:  Thank you.

25              Ms. Blazer?

1          MS. BLAZER: Thank you, Your Honor.

2          I would like to sort of set the stage for what I'm

3     about to say in the context of the continuum between facts,

4     perceptions and emotions.  Because as somebody who has been

5     fortunate to move through life with a relatively ordinary set

6     of emotional and social constructs, I don't have Mr. Walker's

7     perceptions as they relate to facts.  I don't have the

8     emotionality that he experiences in relationship to those

9     perceptions that are then tied back to facts.  And that is

10    because Mr. Walker suffers from Borderline Personality

11    Disorder, which the Court I know is aware of by the PSR, and

12    those terms presented prior to this hearing.  I think

13    Mr. Walker is only the second person I've ever represented

14    who has this disorder.  And I can tell you based on the, just

15    about a year that I've spent with him, that I would not wish

16    borderline personality disorder on my worst enemy.

17         The personality disorders get sort of put in one

18    category, as opposed to mood disorders when we think about

19    criminality and when we think about what we are going to talk

20    about with regard to culpability, mitigation, future

21    dangerousness and all that kind of stuff in a criminal

22    context.  Because I think people who suffer from mood

23    disorders traditionally are treated with a kinder eye toward

24    mitigation than ordinarily those in the personality disorder

25    category, because in the personality disorder category, we

1    tend to say these are characterological issues that can't be

2    undone and that represent antisocial thought patterns.

3          If I might, I just would like to read into the

4    record the characteristics of borderline personality

5    disorder, because it is not a personality disorder that is

6    like any social personality disorder or narcissism or those

7    kinds of disorders.

8          According to the DSM, borderline personality

9    disorder is marked by frantic efforts to avoid real or

10   imagined abandonment, a pattern of unstable and intense

11   interpersonal relationships, characterized by altering

12   between extremes of idealization and devaluation.  Identity

13   disturbance, markedly and persistently unstable self-image

14   and sense of self, impulsivity in areas that are potentially

15   self-damaging, such as spending, substance abuse, sex,

16   reckless driving or binge eating, recurrent suicidal

17   behaviors or gestures or self-mutilating behavior.  Effective

18   instability due to marked reactivity of mood.  Chronic

19   feelings of difficulty controlling anger or other emotions

20   and transient stress-related paranoid ideation or severe

21   dissociative symptoms.  As I said, I wouldn't wish that set

22   of symptoms on my worst enemy.

23         Mr. Walker is somebody whose background in terms of

24   having been a victim of repetitive sexual assault as a child

25   set him up for borderline personality disorder.  And Dr.

Mulbry, who was actually retained by one of Mr. Walker's
earlier lawyers, has told me that he's never seen a more
textbook case of the disorder than Mr. Walker. He suffers
from every single one of those issues that I described to the
Court. And they are -- they are debilitating on Mr. Walker,
and then of course have had consequences -- his behaviors
have had consequences on others, as we well know in this
case.

       But as the Court is aware, Mr. Walker did have two
lawyers before he had me. And those relationships were
marked by real difficulty, difficulty between --
interpersonal difficulty between him and his other two
lawyers. And I believe that they would say that he would
say, and that I can say from my own interactions with him,
that that is a function of the challenge of interpersonal
relationships that is a direct result of the difficulties in
perceptions that Mr. Walker deals with. He and I have had
great success in trying to start first with facts and move
from those facts to the perceptions that he attaches to those
facts, and the way that those perceptions differ from mine.
Because as you sit up on the bench, and as I stand here
today, there is no explanation or excuse for what happened in
this case. There is, however, a markedly different set of
perceptions that Mr. Walker had at the time that this was
going on than those that you or I would have experienced

under the same circumstances.  And he is going to address the

Court in detail about what he perceived at the time, what he

has come to learn since then, and what he knows he still has

to do.        Mr. Walker is very realistic about the fact

that his journey toward recovery is at the beginning.  At his

own expense, with the assistance of his family in Maine, he

has Ellie Smith, who is known to this Court as a counselor

who is attached to the drug program for many years visit him

regularly at the jail.  She has engaged with him in dialectic

behavior therapy, which is the gold standard therapy for

people with Borderline Disorder.  It is an offshoot of

cognitive behavioral therapy.  It is specifically intended to

assist somebody like Mr. Walker in confronting those

perceptions and beliefs that arise out of misperceptions on a

regular basis to form more pro social behaviors and pro

social understandings of their environment.  And she has

recommended, as you are aware, that he continue specifically

with DBT therapy.

        I have, and with his assistance, done as much

research as I knew how to do into what might be available to

him at the Bureau of Prisons in terms of dialectic behavioral

therapy.  It appears to me that he is not going to qualify

for the only DBT program that exists at the Bureau of Prisons

because he is not a -- he has not demonstrated, while at the

Charleston County Detention Center, any behaviors that

represent maladjustment to confinement.  And it -- the only

two programs that provide DBT therapy at the Bureau of

Prisons are for high security inmates who have shown

maladjustment to their environment.  And they are -- so those

two programs only exist at Terre Haute and ADX in Florence,

Colorado.  Those are not the kinds of places that I

anticipate that Mr. Walker would be sent to, nor do I believe

he should be sent to those.

So then we've got to start looking, stepping down at

what kinds of other programs might provide appropriate

interventions for him.  As he moves through the prison system

during whatever term of incarceration you might impose, the

Court, I'm sure, is aware of the existence of the Residential

Drug and Alcohol Program.  Given Mr. Walker's prior history

of drug addiction, and drug abuse, he may be considered for

the nonresident program.  I do not believe he will be deemed

qualified for the residential program because his addiction

has been in check for a period of time, longer than they

require for admission.  So that leaves two other kinds of

programs.  One is the Resolve program, which I believe is

offered at a small number of facilities on the Eastern

Seaboard, and that is a behavioral therapy intervention

program for people who have been victimized by trauma, as he

was throughout his childhood.  And the other is a mental

health step down unit, which is a sort of intermediate

1     outpatient-based mental health commitment that is not for

2     people with serious mental illness in the sense of, you know,

3     psychotic disorders or things like that, but who are facing

4     mental health difficulties.

5          So when the Court considers what an appropriate

6     sentence is, I would ask that you recommend that he be

7     evaluated for placement in such -- in one of those types of

8     programs, because when we think about the 3553 factors in

9     terms of deterrence and rehabilitation, which I think are

10    interconnected, ensuring that Mr. Walker receives the best

11    treatment he possibly can is the best thing that we can do to

12    ensure that you never hear from him again.

13         And again, his efforts at rehabilitation have been

14    as substantial as they could be thus far under the

15    circumstances.

16         In addition to the treatment he's undertaken with

17    Ms. Smith, he has under -- he has taken every course he was

18    eligible to take through the Veterans Upward Bound program.

19    And he recently completed -- I did not have a certificate for

20    it -- but he did recently complete a coping skills workshop

21    offered through Charleston Mental Health that he tells me has

22    been extremely helpful to him in managing his anxiety and

23    his -- his difficulty in sort of daily encounters.  And I can

24    say that I have seen the benefit of that program in our

25    interactions.

1          Another thing that I would ask the Court to consider

2     when you fashion your sentence is that not withstanding the

3     very troubling nature of the conduct in this case on its

4     face, there is no evidence that Mr. Walker ever engaged in

5     any prior age inappropriate interactions with women in his

6     life.  I think this came at a sort of perfect storm both for

7     this young lady and for Mr. Walker, and I do not believe

8     there is any evidence that outside of this one relationship

9     there has ever been any effort to have her maintain

10    inappropriate conduct with minors.

11         And another thing that I think the Court should be

12    mindful of as it fashions a sentence is on that sort of facts

13    versus perceptions spectrum, Mr. Walker did not hide what he

14    was doing from his ex-wife, from his parents.  And I think

15    that that represents his belief that the Court alluded to

16    earlier in overruling my objection that Mr. Walker's beliefs

17    about what he was doing were not hard hearted, were not evil

18    in their intent.  They were certainly harmful to him and to

19    Ms. May, and then to the collateral people in his life who

20    have suffered.

21         And that leads me to Sahara, his daughter.  You

22    received a letter from her.  She is -- he speaks to her

23    almost every day.  He has maintained a relationship with her,

24    not withstanding their substantial distance from one another

25    over the last two years of his confinement, not withstanding

the fact that he and his ex-wife are no longer married.  And, you know, she's got -- they certainly have the issues that any formerly married couple might have that are then compounded by this situation.  She has always made it a priority for Sahara to have a relationship with Mr. Walker, or if not always, most of the time.  And they do talk regularly, and he is committed to being the best parent he knows how to be to Sahara going forward.  And I believe there are letters that you've received that document his --

THE COURT:  Every one of them mentioned his relationship with his daughter.

MS. BLAZER: That's right.  So for all of those reasons, chief among them that Mr. Walker seeks to improve, seeks to be a better person, seeks to understand the past and to learn from it in the future, because I believe he has already undertaken the punishment portion of the sentence you will impose with the seven -- I believe it's 751 total days of confinement as of today, I would ask that you fashion a sentence that allows him to return to an ideal mode of therapy at the earliest possible opportunity.

I'm happy to report, as I did to him this morning, that he no longer has any other pending charges related to this conduct in any other district or state court, and I believe that that will make him eligible toward the end of whatever sentence you impose for the halfway house.  He's

1    going to need that because he's lost all material possessions

2    he ever had during the course of this confinement.  He's

3    going to need to go to a halfway house.  He's going to need

4    to start working and saving money to begin to pay for rent

5    and food and all those sorts of things.  And because he no

6    longer has any other charges hanging over him, I believe he

7    will be eligible for the halfway house at the end of any

8    sentence you impose.

9         The facts of this case on their face would trouble

10   any parent, any grandparent, and all I can represent to the

11   Court is that I believe that this is a dreadfully unfortunate

12   but extremely isolated encounter that is not going to be

13   repeated by Mr. Walker in any way going forward.  And that

14   not withstanding the damage that it caused, was -- should be

15   mitigated in this Court's eyes by the difficulties of

16   perception and impulsivity that Mr. Walker suffers from as a

17   result of his bi -- I'm sorry, not bipolar -- Borderline

18   Personality Disorder.  And I would ask that you fashion a

19   sentence that takes those mitigating factors into

20   consideration.

21        And at this time, I believe Mr. Walker would like to

22   address the Court.

23        THE COURT:  Mr. Walker, how about come up to the

24   podium where we can talk more easily.

25        MS. BLAZER: Before he reads his letter, I want you

1    to know that as a lawyer, we try to sometimes control the

2    things that our clients say to you.  We try to make -- help

3    them present their best selves and their best words to you.

4    I have not done that with Mr. Walker here today because I

5    want you to hear in his words his perceptions, his

6    challenges.  These are unfiltered and unvarnished.  I'm aware

7    of what he's going to say to the Court.  And as I told him

8    yesterday, under other circumstances, with somebody who

9    wasn't dealing with the same emotional difficulties that he's

10   dealing with, I would probably be editing what he's going to

11   say to you.  But I have not edited it, and this is his

12   unedited set of thoughts on the subject.

13        THE COURT:  Okay.  Mr. Walker, I'll be glad to hear

14   from you.

15        THE DEFENDANT: Your Honor, the first thing I would

16   like to do is apologize to this Court, and all the people

17   that have expended both their time and resources because of

18   my actions.  I would like to apologize to my friends and

19   family, especially my daughter, for leaving her without a

20   father to guide her.  Even though we talk daily, I know it's

21   not the same and I understand her pain.  I am fortunate

22   enough and eternally grateful to have all their support.  I

23   know the main reason I have their support is because of my

24   openness, honesty, integrity, and they know I never meant any

25   harm towards Hannah.  Even though I have been painted

1   obscurely, they know who I truly am and they believe in me.

2            Most of all, I wish to say I'm sorry to Hannah for

3   failing her.  I hope she truly knows how much I love her.

4   Your Honor, this case is very convoluted and has so many

5   facets it's almost impossible to show the truth and the whole

6   story without it looks like I'm condoning my actions.  I am

7   not condoning my actions.

8            I know now even though Hannah seemed like an adult

9   by telling me that she had other adult relationships with

10  older guys, which I found out from the discovery, two of them

11  ended in prosecution, I should never have allowed our

12  relationship to happen.  I have no desire to say anything bad

13  about Hannah because of our connection, being both survivors

14  of child abuse, it distorted both our deceptions.  Hers when

15  her mother pimped her out, mine from my two half brothers.

16  We understand -- we understood each other's pain and feelings

17  of betrayal.  It forces to you grow up too quick.  I dealt

18  with mine by claiming my independence at a young age, the

19  same as Hannah wanted.  I tried to give her that independence

20  as much as she tried to fight for it.  She tried working on

21  getting emancipated.  I understand that she did unhealthy

22  behaviors, being promiscuous, sending nude photos to other

23  guys and cutting.  I understood because I did these behaviors

24  when I was young, too.  I only wanted to take her pain away,

25  give her a voice and come through this as a functioning

person.  I tried telling her that I would be a father to her. She told me she had a father, he was dead, and she wanted a husband.

I thought I could fix her and I know now I was wrong.  I should not have given her the option to choose between being a child and an adult.  Even though she acted as a wife to me and a mother figure to my daughter, I realized too late that it was only an act, she didn't have the capacity or the weight for her convictions.  And even though my role was always passive, I'm no less culpable.

Your Honor, the night of October 20th when I -- when Hannah called me to pick her up, all I wanted was for her to be in a safe and happy place.  It wasn't for sex.  I never traveled explicitly for sex, and it wasn't my reason for our relationship.  It was for the same reasons her stepmom called me earlier in the year to pick her up and allow her to live with me because of an ongoing physical abuse by her mother's boyfriend and her mother spending money allotted to Hannah from her dad's death benefits for drugs and alcohol, and not on resources for food for her and her brother.  I feel like I owed to Hannah that I gave her back to her abuser.  I prayed to God that he allowed me to do what was right.  And even though I wasn't on the right path, I see how he planned to set me on it.

I knew things were not the way they should be, that

both Hannah and I needed help.  I thought if she wasn't
allowed to live with me, she could live with my parents until
we were married.  I know now I was right in trying to help
her, but wrong in the way, in the how and by having an adult
relationship with her.  I see the correlation of how I didn't
allow myself to finish my childhood and my flawed logic of
thinking at the time that this was okay.  Just as I should
have found a way to finish my childhood when I was young, I
should have found a way for Hannah to finish her childhood
and finish growing up.  And because I didn't, I'm truly
sorry.

Your Honor, I can tell you, jail has been good for
me and has helped me out immensely.  I have lost every
material thing -- and I'm not saying this because it was
easy -- I've lost every material thing that I own and have
gone through huge emotional turmoil.  But as it says in
Matthew 6:19, "Do not store up for yourself treasures on
earth where moth and vermin destroy and thieves break in and
steal.  But store up for yourselves treasures in Heaven,
where moth and vermin do not break in and steal.  For where
your treasure is, there is also your heart."  Through all
this, I have gained some clarity.  I know that -- I know
that -- I know it is because being in jail has allotted me
time to look at myself introspectively.  And through the work
that I have done, such as Bible studies with Brother Al,

coping skills class that has shown me how to deal with the
past issues and emotional challenges, and change my behavior
so the issue won't ever manifest again.  All the work Ms.
Ellie Smith and I have done, and my lawyer, Ms. Cameron
Blazer, has helped facilitate and guide me.  The never ending
support and contact with my family, the sharing of all this
with my friend, and most of all my daughter.  I have been
blessed by her in being able to talk to her almost on a daily
basis.  I can't put this into words what she means to me.
She is the reason I gave up drugs ten years ago.  And the
relationship I have for her is incredible.  Even though it's
not the same as being with her, still I have still been able
to be a father even more so than some fathers since we focus
on our talks on quality and not quantity.

She knows that she can talk to me about anything.
And we have never had secrets from each other.  She is the
most beautiful person I know.  Because of the relationship I
have with my daughter and my God, I strive to be a better
person every day.  Your Honor, I do know the burden I have
put on all these people, and society, too.  I owe them all,
and I wish to carry my own weight and meet all my
obligations.

I wish to get out as soon as possible and to make
the transition via halfway house with supervised release in
using what I learned here and keep my real visitation on

1     track with my church, group therapy, personal therapy and

2     exercise and work.  I feel by meeting these obligations I

3     will pay back my debt to society and helping others by

4     sharing my story with others as a survivor of child abuse and

5     how it has warped and obscured my thinking and actions and

6     has brought me here.

7              Your Honor, last of all, I will accept whatever you

8     deem appropriate as a sentence.  My faith is in God.  I will

9     be where I need to be and can keep growing no matter what I

10    am.

11             Thank you.

12             THE COURT:  Thank you.  I see some folks in the

13    courtroom.  If anyone has traveled here and would like to be

14    heard, I'll be glad to hear from you.

15             MS. BLAZER: No, sir.  Your Honor, as I think

16    mentioned in their letters to you, although they are very

17    supportive of him, Mr. Walker's mother and father are in

18    their eighties and could not come from Maine to be here, but

19    they are absolutely -- they have stood behind him.  I have

20    talked to him regularly throughout this process and they will

21    be a resource for him going forward.

22             THE COURT:  Okay.  Thank you.  You may return to the

23    table.  Anything further from the Government?

24             MR. MAY: Your Honor, I'll leave it in your court as

25    far as how to deal with the Borderline Personality Disorder.

1    I think that that cuts both ways in a 3553 analysis, as far

2    as protecting the public from the crime that he committed and

3    deterrence.

4         The only exception the Government would take is that

5    this is characterized as an extremely isolated incident.

6    This happened over a 12- to 18-month period of time.  It was

7    repeated.  I hope that he means the words that he read to

8    you, I truly do; however, that doesn't excuse a man who knows

9    the problems that abuse causes for hurting a child for that

10   extended amount of time.  And I would submit to the Court

11   that a Guideline sentence is appropriate.

12        THE COURT:  Thank you.  Let's meet with the

13   probation officer for a few minutes in the jury room, please.

14   Take a brief recess.

15        (Thereupon, there was a brief recess.)

16        THE COURT:  This is a very difficult and really

17   tragic case.  I guess more than anything, it's an example of

18   what child abuse can do.  Both the defendant and the victim

19   in this case were locked into, I guess the tortures of being

20   abused as children at the same time.  I've already ruled the

21   enhancement because of the age difference, etcetera, was

22   appropriate, but I do believe that facilitating factor was

23   the relationship they had that kind of symbiotically fed off

24   of each other.  This child, I worry about her today, she's

25   gone, they can't find her, the parents are gone.  If any of

what was reported, what was said on this record that she
presented to him about her situation, I continue to worry for
her because the future is not bright in any way or manner,
but it could get worse.  And it was kind of a perfect storm,
is the best way I see it, as to how all this came about.  And
I say that because the defendant has many problems, which
he's aware of and has acknowledged, but this offense,
relationship he's had with an underaged person, as despicable
and horrible as that is, the circumstances under which it
came about in this case are bizarre, to say the best.  I
can't imagine where those around him -- and I'm not placing
blame or sentencing anybody but him -- but her mother, her
stepmother, and others had to know or suspect what was going
on, or they were blind.  And I can't imagine that his
parents, when he took the child there and let her stay, they
may have thought they were helping, too, but you had all
these people on the outside who were not involved and who had
not been damaged in their judgment by these past experiences
and nobody intervened on behalf of this child, and that
bothers me.         I've decided to vary because of the nature
and circumstances of the offense.  This is the sole incident
involving an underage person.  There is no question but that
Mr. Walker had every symptom listed for Borderline
Personality Disorder, and I think he suffered with every one
of them, and that had a lot to do with this whole horrible

offense.  His past abuse as a child contributed greatly to

not only that condition, but to his involvement in this

situation with this young woman.  I think it's significant

that he tried to turn himself in.  I think it's significant

that he has made substantial efforts at rehabilitation and

trying to get the appropriate help.  And so I think to that

degree that is what the 3553(a) factors are about.

He has a daughter who is ten years old.  And every

letter that was written to me, particularly hers, she's had

to grow up before her time.  Stresses how much she wants and

needs him in her life and what a positive influence he is in

her life.  And I think that that is important so that we

don't have yet another child victimized by all this.

So with that, it's the sentence of the Court that

the defendant, Alan Walker, is committed to the custody of

the Bureau of Prisons for a term of 57 months.

I want to place on the record why I chose that.

I've already acknowledged and ruled that the enhancement was

appropriate.  If it had not been an enhancement, the

Guideline range would have been 57 to 71 months.

Given his efforts at rehabilitation and his

daughter's needs and his need for appropriate treatment,

which I'm not sure will be available to him in our Department

of Corrections, I think that he needs to get the treatment

and continue it in the manner that he has it now.

The defendant does not have the ability to pay a
fine so a fine is waived.  The victim has not requested
restitution.

The defendant must pay a $100 special assessment fee
due beginning immediately.

Upon his release from imprisonment, he'll be placed
on supervised release for a term of five years.  Within
72 hours of release from the custody of the Bureau of
Prisons, the defendant shall report in person to the
probation office in the district to which he's released.

And while he's on supervised release, the defendant
must comply with the mandatory and standard conditions of
supervision as they are outlined in Title 18, Section
3583(d).  Also the following special conditions for the
reasons set forth in the Presentence Report which have been
previously adopted by the Court in its findings of fact.

One, the defendant shall not communicate or
otherwise interact with the victim, either directly or
through someone else.  That is justified by the offense of
conviction.

Mr. Walker, stand up, if you would.  I want you to
understand what I'm telling you.  I believe you when you say
you love her.  And I know at one point you would have liked
to have married her.  You may still feel that way.  You may
not have any contact with her, and if you do, you will be

1    arrested and sent back to prison.  I want that perfectly

2    clear.

3              THE DEFENDANT: Yes, Your Honor.

4              THE COURT:  The defendant shall participate in a

5    computer Internet monitoring program and abide by the rules

6    of that program as approved by the probation officer.  And

7    that is justified again by the offense of conviction and to

8    monitor the defendant not contact the victim either directly

9    or indirectly.

10             The defendant shall participate in a program of

11   mental health counseling and/or treatment as deemed necessary

12   by the probation officer until such time as he's released

13   from the program by the probation officer.

14             The defendant shall participate in a sex offense

15   specific assessment to determine if sex offender treatment is

16   needed, as talked about earlier, and discussed in the

17   Presentence Report, and during counsel's presentation to the

18   Court.

19             Additionally, if the sex offense specific assessment

20   determined that the sex offense treatment is needed, the

21   defendant shall submit to random polygraphs for treatment

22   purposes, as well as compliance to the standard conditions of

23   supervision to be conducted by any person deemed appropriate

24   by the probation officer as a treatment tool to be used in

25   conjunction with any of the sex offender treatment programs,

1    with the following limitations:  Answers to questions asked

2    during a polygraph test cannot be used against the defendant

3    in any criminal proceeding other than an action to extend,

4    modify or revoke supervised release.  Also, information

5    obtained during the polygraph testing cannot be made public

6    or released to the state or any prosecuting authorities.  And

7    additionally, any fact obtained during the polygraph testing

8    cannot be used in a civil commitment proceeding under state

9    or federal law.  The defendant shall pay copayments to the

10   total cost of the polygraph.  These payments shall be made in

11   addition to copayments made for any sex offender treatment

12   and shall be based on a sliding scale, which has been set up

13   through the probation office.  The defendant shall contribute

14   to the cost of any treatment, drug testing and/or location

15   monitoring not to exceed an amount determined reasonable by

16   the court-approved sliding scale I just referenced, and shall

17   cooperate in securing any applicable third-party payment,

18   such as insurance or Medicaid.

19          Does either the Government or the defendant object

20   to the form of the sentence?

21          MR. MAY: No, Your Honor.

22          MS. BLAZER: No, sir.

23          MS. BENEFIELD: Your Honor, so the defendant does

24   have to register as a sex offender?

25          THE COURT:  Yes.  Well, didn't I say so?

THE CLERK:  No, sir, number six.

THE COURT:  I'm sorry.  Thank you.

Mr. Walker, you have a right to appeal this sentence if you wish.  Any sentence of appeal must be filed within 14 days after the judgment in the case is entered.  That will probably be today.  If you so request, the Notice of Appeal can be filed by the Clerk of Court on your behalf.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT:  All right.  Now come up to this podium and let's talk a minute.  When you leave this courtroom today, I don't want you to have any misunderstandings, and I don't think you do, but I also want you to understand what is probably implied, and I have been very specific in what I've had to say, but I want you to understand these additional things:  You have a real problem and your treatment has helped you thus far.  That is one reason you got a variance. Seems to be working and you want it and you are going after it, you want it to work.  The length of time over which you conducted this affair shows absolutely terrible judgment in impulse control.  If you ever let that happen to you again, you are gone.

Now, life has not been fair to you, and you are walking through life with substantial handicaps, but you've got to learn to deal with them in such a way that you don't

1    end up in court again.  And the quickest way is to ever be

2    involved with an underage person with sex.  The fastest way

3    to get you in trouble is to have any contact with this young

4    woman.  Now, mind you, she may contact you, or try to contact

5    you.  If she does, you may not in any way respond to the

6    attempt.  And if you do, you report it -- if she does, you

7    report it to the probation office.

8            You understand that?

9            THE DEFENDANT: Yes, Your Honor.

10           THE COURT:  Okay.  With that, I wish you good luck.

11   Thank you.

12           MS. BLAZER: Would you consider recommending that he

13   be evaluated for the mental health step down program at

14   Butner?

15           THE COURT:  I meant to do that.  I think he should

16   be evaluated for placement in the very best treatment program

17   available at Butner, or whatever institution he's

18   incarcerated in.  And I think it's absolutely pivotal in his

19   chance of success and not being a recidivist.

20           Thank you.

21           MR. MAY: At this time the Government would move to

22   dismiss the remaining counts of the Indictment.

23           THE COURT:  That motion is granted.  Thank you.

24                   *****     *****     *****

25

1

2    I certify that the foregoing is a correct transcript from the

3    record of proceedings in the above-titled matter.

4

5

6

7    --------------------------

8

9    Amy C. Diaz, RPR, CRR            November 30, 2017

10   S/  Amy Diaz

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25